## Case No. 13,264.

### The SPRINGBOK. .

[Blatchf. Pr. Cas. 434; 1 Betts' Pr. Cas.]

District Court, S. D. New York.   July 30, 1863.[2]

PRIZE — ATTEMPT TO VIOLATE BLOCKADE — DESTINATION OF VESSEL.—FALSE PAPERS— CONTRABAND CARGO.

1. Invocation of proofs from two other cases on the docket of the court for trial at the same time with this case, allowed, under the 33d standing rule of the court in prize cases. *Held*, that the inference was a fair one, that the cargo of the vessel in this case had the same destination which the court had found to be the destination of the cargoes in the other two cases, that is, to the enemy's country through a breach of the blockade.

2. In addition to the practice of invocation, it is the uniform practice of prize courts to take cognizance of the status of the claimants who appear before it, with a view to see whether they come with clean hands, or whether they have been before engaged in a traffic similar to that with which they are charged in the particular case.

3. The principles announced by this court in the case of The Stephen Hart restated and applied. [Cases Nos. 13,363 and 13,364.]

4. The well-settled rule of law is, that where contraband goods, destined for the use of the enemy, are found on board of a vessel, all other goods on board of that vessel belonging to the owner of the contraband articles, even those goods which are innocent, must share the fate of the contraband goods.

5. The penalty of contraband extends to all the property of the same owner, involved in the same unlawful transaction; and, therefore, if articles which are contraband, and are going to the enemy, are on board of the same vessel with articles which are not contraband, and all the articles belonging to the same owner, all will be alike condemned, the innocent articles being affected with the contagion of the contraband articles.

6. Alleged ignorance of the master as to the reason assigned for the capture of his vessel.

7. It is a principle of prize law, that a master cannot be permitted to aver his ignorance of the contents of contraband packages on board of his vessel, and that he is bound, in time of war, to know the contents of his cargo.

8. The cargo of the vessel was intended to be delivered in the enemy's country, by trans-shipment, at Nassau, into a vessel in which it should be carried through the blockade; and such was the intended destination of the cargo on its departure from England.

9. The papers found on board of the vessel, so far as they represent Nassau as the ultimate destination of the cargo, were false and simulated.

10. There was no bona fide intention of landing the cargo at Nassau, for sale or consumption there, so that it might be incorporated, at Nassau, into the common stock in that market; but, if it was to be landed there at all, it was only to be so landed for the purpose of being trans-shipped, in bulk, into another vessel, in pursuance of the original destination of the cargo to the enemy's country.

11. Defective character of the bills of lading and manifest of the cargo.

12. No invoices of the cargo were found on board of the vessel.

13. The absence from on board of a vessel in time of war of invoices of her cargo is laid down by all the authorities as being a suspicious circumstance as affecting the question of the honesty of the commerce.

14. In time of war a vessel should be furnished with documents showing the particulars of her cargo, especially where the vessel is documented for a neutral port in the vicinity of the ports of one of the belligerents, and that neutral port is one extensively used as a mere port of call or trans-shipment for vessels and cargoes bound to ports of the enemy, and where the parties claiming to own the cargo have been engaged in previous adventures connected with running the blockade or introducing cargoes of contraband goods into the enemy's country.

15. The fact that the test oath to the claim in this case is made not by the claimants but by their proctor, and the peculiar language of the proctor's affidavit, commented on.

16. The contraband articles found on board of the vessel condemned, as having been destined for the enemy's country, and the entire cargo also condemned, as belonging to the owners of the contraband goods.

17. The vessel, in this case, was employed in carrying on the unlawful enterprise of transporting contraband articles on their way to the enemy's country, to be there introduced by a violation of the blockade, and she was so employed under such a state of facts as made her owners responsible for the unlawful transportation of the contraband articles, and for the acts of the master in relation to such transportation, to such an extent as to justify the condemnation of the vessel.

18. Formerly, the mere fact of carrying a contraband cargo rendered the vessel liable to condemnation, but the modern rule is different. The carrying of contraband articles is now attended only with loss of freight and expenses, unless the vessel belongs to the owner of the contraband articles, or unless there are circumstances of fraud as to the papers, and the destination of the vessel or the cargo, and thus an attempt, under colorable appearances, to defeat the rights of the belligerent.

19. Where the owner of the vessel is himself privy to the carriage of contraband, or where the master of the vessel, as the agent of such owner, interposes so actively in the fraud as to consent to give additional color to it by sailing with false papers, the modern relaxation in favor of the vessel no longer exists.

20. The master of the vessel, in this case, was carrying a cargo composed in part of contraband articles, under false papers. He, and the owners who appointed him as their agent, must be regarded as affected with knowledge of the contraband articles on board, and of their destination, to the same extent as if actual knowledge thereof were brought home to the master and the owners.

21. And the owners are responsible for the documenting of the cargo by the master, by means of the bills of lading, to a neutral port, when it was in fact destined, composed in part of contraband goods, to a port of the enemy.

22. If the owner of a vessel places it under the control of a master who permits it to carry, under false papers, contraband goods, ostensibly destined for a neutral port, but in reality going to a port of the enemy, he must sustain the consequence of such misconduct on the part of his agent.

23. From the moment a vessel, having on board contraband articles which have a destination to a port of the enemy, leaves her port

1 [Reported by Samuel Blatchford, Esq.]

2 [Affirmed in part and reversed in part in 5 Wall. (72 U. S.) 1.]

of departure, she may be legally captured; and it is not necessary to wait until the goods are actually endeavoring to enter the enemy's port, for, the transportation being illegal at its commencement, the penalty immediately attaches.

24. The privilege of further proof is always forfeited where there has been any deception or fraud.

25. Vessel and cargo condemned.

[In admiralty. See Case No. 13,263.]

BETTS, District Judge. On the 3d of February, 1863, in latitude 25° 35' north, and longitude 73° 40' west, the United States steamer Sonoma captured, as lawful prize of war, the bark Springbok. The place of capture was from 150 to 200 miles east of the port of Nassau, N. P. A libel was filed against the Springbok and her cargo on the 12th of February, 1863. The libel alleges that the bark, when captured, was "making for the harbor of Nassau." On the 26th of February, 1863, the court made an order that the cargo of the bark be unladen by the marshal, under the superintendence of the prize commissioners, and be stored in some suitable warehouse, and that an inventory of the cargo be made by the marshal. The reason for making this order was that the cargo was being damaged, by reason of the leaky condition of the deck of the vessel. The report of the prize commissioners, as to the discharge of the cargo under this order, was filed on the 9th of April, 1863, and was accompanied by a list of the packages and cases composing the cargo, and of their marks and numbers; but the packages were not opened. So far as this report shows, the cargo consisted of 4 cases of samples, 3 cases and 4 hogsheads of merchandise, 10 kegs of saltpetre, 15 barrels of mustard, 17 barrels of Epsom salts, 18 bags of pimento, 10 bags of cloves, 60 bags of pepper, 4 cases of root ginger, 2 cases of nutmegs, 220 bags of coffee, 150 chests and 150 half chests of tea, 2 cases of drugs, 1 coil of rope, 4 barrels of pork, 3 water casks, ½ of a barrel of pitch, 86 bales of dry goods, 641 cases of dry goods, and a quantity of tin plate in boxes, said to be 606 boxes. One of the cases of samples was marked, "B. W. Hart, Esq., Nassau." Eighteen of the cases of dry goods were reported as marked, "A." in a diamond, "S. I., C. & Co." On the 10th of March, 1863, a claim to the bark was filed on behalf of Thomas May and John E. Oxenberry, both of Falmouth, England, and of the personal representatives of Richard May, deceased, as owners of the bark. The claim set up that the vessel was a British vessel; that her owners were British subjects; and that, at the time of her capture, she was bound from London to Nassau, N. P., and was to have landed her cargo at Nassau, and that there, as to such cargo, her voyage would have fully ended. This claim on behalf of the owners of the vessel was made by James May, the master of the vessel, and the test oath to the claim was made by the master. In that oath he represents himself as the son and agent of Thomas May.

A claim to the cargo of the bark was filed on the 10th of March, 1863, by Mr. Archibald, the British consul at New York, who intervened for the interest of its owners, and set up that the cargo belonged to British subjects, but did not disclose the name of any owner, and alleged that the vessel was, when taken, on a legitimate voyage from one British port to another. The test oath to this claim was made by Mr. Archibald. On the 24th of March, 1863, a claim to the whole of the cargo was filed on behalf of Samuel Isaac and Saul Isaac, composing the firm of S. Isaac, Campbell & Co., of London, England, and Thomas Sterling Begbie, of London. This claim set forth that the claimants were British subjects, and owners of the whole of the cargo of the bark; that she was a British vessel; that the cargo was put on board at London, consigned direct to Nassau, N. P., another British port, where the whole of it was to have been landed, and the voyage as to the same was to have ended; that the whole was consigned to Benjamin W. Hart, their agent and consignee, at Nassau; and that the capture was unlawful, for the reason that the vessel and her cargo were, both of them, on a lawful voyage, under the British flag, between England and Nassau. This claim on behalf of the owners of the cargo was made by Mr. Kursheedt, their proctor, as their agent. He also made the test oath to the claim. This test oath sets forth, among other things, that the cargo of the bark was to be "landed permanently" at Nassau, and that "it was not intended that the said bark should enter, or attempt to enter, any port of the United States, or that her cargo should be delivered at any such port, but that the true and only destination of such cargo was Nassau aforesaid, where the said cargo was to be actually disposed of, and the proceeds remitted to said claimants;" that the "cargo was not shipped in pursuance of any understanding or agreement, either directly or indirectly, with any of the enemies of the United States, or with any person or persons in behalf of, or connected with, the so-called 'Confederate States of America,' but was shipped with the full, fair, and honest intent to sell and dispose of the same absolutely in the market of Nassau aforesaid." All the averments in this test oath are stated in it to be made by Mr. Kursheedt on information and belief; and in it he states that it is impossible to communicate with the claimants in time to allow them to make the claim and test affidavit, and that his information is derived from letters and communications very lately received by him from them, and from documents in his possession, placed there by the claimants.

There were found on board of the bark at the time of her capture a log-book, two cargo books, her register, her shipping articles, five bills of lading, a manifest of the cargo, a copy of a charter-party, a letter from Spyer & Haywood, as agents of the charterer, to Cap-

tain May; a letter from Spyer & Haywood, as agents of S. Isaac, Campbell & Co., to B. W. Hart, Esq., Nassau; and sundry other papers, such as a receipt for light duties, a certificate of the shipment of the crew, a clearance, some shipping bills, and a victualling bill. The log-book, the bills of lading, the manifest, the clearance, and all the other official papers of the vessel speak of her voyage as one from London to Nassau. The date of her clearance from London was December 8, 1862. The register of the bark describes her as a British-built vessel, registered at Falmouth on the 14th of March, 1860, and of the burden of 188.17 tons. The certificate of registry states that, at its date, Thomas May was sole owner of vessel; and there is an indorsement upon it, showing that on the next day, namely, the 15th of March, 1860, Thomas May, Richard May, and John E. Oxenberry became the registered owners. It appears, by the certificate, that Richard May was master of the vessel at its date, and, by indorsements on the certificate, that on the 17th of May, 1862, Thomas May was appointed master; and on the 19th of May, 1862, one Percival was appointed master; and that on the 25th of November, 1862, James May was appointed master. The charter-party is dated at London, November 12, 1862. The charter is from "W. Barter & Co., by authority of T. May," to Thomas Sterling Begbie, of London, for a voyage to Nassau, with a cargo of "lawful merchandise goods," the freight to be paid one-half in advance, on clearance, and the remainder, in cash, on delivery; thirty days running to be allowed the freighter for loading at the port of loading and discharging at Nassau. There is an indorsement on the charter-party, dated "London, 8th December, 1862," and signed "Spyer & Haywood," as follows: "Sixteen days have been expended in this port in loading and despatching the vessel, this day included." One of the letters found on board is signed "Spyer & Haywood, Agents for the Charterer," and is dated "London, 8th December, 1862," and is addressed, "Captain James May, barque Springbok." It says: "Your vessel being now loaded, you will proceed at once to the port of Nassau, N. P., and, on arrival, report yourself to Mr. B. W. Hart, there, who will give you orders as to the delivery of your cargo, and any further information you may require." The other letter is signed "Spyer & Haywood, Agents for Messrs. S. Isaac, Campbell & Co.," and is dated "London, 8 Decr., 1862," and is addressed "B. W. Hart, Esq., Nassau." It says: "Under instructions from Messrs. S. Isaac, Campbell & Co., of Jermyn street, we enclose you bills of lading for goods shipped per Springbok, consigned to you." The shipping articles are for "a voyage from London to Nassau, N. P., thence, if required, to any other port of the West India Islands, American States, British North America, east coast of South America, and back to the final port of discharge of cargo in the United Kingdom, or continent of Europe, between the Elbe and Brest, and finally to a port in the United Kingdom; voyage, probably, under twelve months."

The five bills of lading found on board were severally marked by the prize commissioners Nos. 2, 3, 4, 5, and 6, and are known by those numbers in the proceedings in the cause. Nos. 2, 3, and 4 are each of them marked, "Captain's Copy," and are not signed by the master. Nos. 5 and 6 are, each of them, signed by the master. No. 2 is a duplicate of No. 6, and No. 4 is a duplicate of No. 5. There is no duplicate of No. 3. It is supposed that Nos. 5 and 6 were those enclosed in the letter from Spyer & Haywood to Hart, as they are each of them signed by the master, and each has upon it a revenue stamp, while Nos. 2, 3, and 4 are wanting in said stamps, for the reason, probably, that they are merely copies retained by the master. In Nos. 2 and 6 the shippers are "Moses Brothers," and both of those bills of lading are indorsed "Moses Brothers," in blank. The shipment by bill No. 6 is "six hundred and sixty-six packages of merchandise, being marked and numbered as in the margin," to be delivered at Nassau, N. P., "unto order;" freight to be paid "as per charter-party." The margin of this bill specified 150 chests and 150 half chests of tea, 220 bags of coffee, 4 cases of ginger, 19 bags of pimento, 10 bags of cloves, and 60 bags of pepper. This enumeration covers 613 of the 666 packages. The remainder of the packages, 53 in number, are specified in the margin of the bill simply as 7 cases, 10 kegs, and 36 casks. The marks and numbers on all the packages are stated in the margin of the bill. The contents of bill No. 2 are the same in all respects as those of No. 6. Bill No. 3 is a "captain's copy," of which there was no original found on board. It is for two packages of merchandise, specified in the margin, one as "A." in a diamond, "264, 1 bale," and the other as "1,266, 1 case," shipped by "Spyer & Haywood." In all other particulars, this bill is like Nos. 2 and 6. It is not indorsed. Bill No. 4 is a duplicate of No. 5; No. 5 being signed by the master, and No. 4 being marked "Captain's Copy." The shippers are stated to be "Spyer & Haywood, as agents," and the shipment to be "one thousand three hundred and thirty-nine packages merchandise, as per indorsement." In the indorsement there is no specification of the contents of any of the packages, but they are merely stated to be 648 cases, 84 bales, 606 boxes, and 1 trunk. The marks and numbers on the various packages are given on the back of the bill. Only one of them has any address other than its mark and number, and that one is the trunk, which is marked "B. W. Hart.". No. 5 is indorsed in blank by Spyer & Haywood. No. 4 is not indorsed. In all other respects, Nos. 4 and 5 are like the other bills. The manifest contains a list of the 2,007 packages covered by the bills of lading, and gives them the same marks and

numbers as the bills of lading do, but does not describe them any further than by stating them as so many cases, bales, boxes, chests, half chests, bags, kegs, and casks. It states Spyer & Haywood to be shippers of the 1.341 packages, and Moses Brothers to be shippers of the 666 packages, and that the entire 2,007 packages are consigned to "order." This manifest is dated "London, 8 Dec'r, 1862;" and is signed "Spyer & Haywood, Brokers." The log-books speaks of the voyage on which the vessel was when she was captured, as one from London to Nassau. It shows that the crew came on board on the 8th of December, 1862; that the pilot came on board the next day; that then the vessel was towed down the river from London as far as Erith; and that, on the 10th of December, she was towed to Gravesend, and thence made sail, the pilot leaving her on the 12th. The sea log commences at noon of the 13th. On the 15th the vessel put into Falmouth on account of heavy weather, where she remained until the 23d, when she proceeded on her voyage. The last entry in her log is at noon on the 1st of February, 1863, in latitude 24° 18' north, and longitude 69° 04' west. The cargo books give the numbers and marks of each package composing the cargo, with the length, breadth, depth, and solid contents of each, but the packages are simply mentioned as cases, bales, bags, casks, and half barrels, without a designation of the contents, except in the instances of the 606 boxes of tin, the 220 bags of coffee, the 4 cases of ginger, the 10 bags of cloves, the 150 chests and 150 half chests of tea, the 60 bags of pepper, and the 3 cases of samples.

There were no invoices of any part of the cargo found on board of the bark. On the 12th of May, 1863, the court made an order, on the application of the district attorney, that the marshal cause the packages mentioned in the bills of lading marked Nos. 3 and 4, found on board of the vessel, to be opened and examined in the presence of the counsel of the respective parties; and that the marshal take an inventory of the contents of the packages in the presence of the parties, and make a report thereof to the court, showing the character and quantity of the contents of the packages. [Case No. 13,-262.] This order was made upon its being shown to the court that, on the unlading of the cargo by the marshal, 3 cases had been discovered containing brass army and navy buttons, some of which were stamped "C. S. N.," and others "A.," "I.," and "C.," respectively, and all of which purported, by the stamp on the inside, to be manufactured by S. Isaac, Campbell & Co., of London, and also 1 case of swords, 1 case of sword bayonets, 10 kegs of saltpetre, and 606 boxes of tin. On the 27th of May, 1863, the marshal's report of the examination of the packages mentioned in the bills of lading marked Nos. 3 and 4 was filed, accompanied by an inventory of their contents. The articles enumerated in that report which deserves especial mention are the following: 20 bales of "army blankets, butternut color"; 1 case of assorted needles, "manufactured by Isaac, Campbell & Co., London"; 1 case containing "about 320 gross navy buttons," and in regard to which the report says: "These buttons are of the sizes used in the United States navy. They are made of brass, and are marked on the under side 'Isaac, Campbell & Co., 71 Jermyn street, London.' On the upper side they are stamped 'C. S. N.,' with the impress of a foul anchor and two cannon"; 2 cases containing "about 616 gross army buttons," in regard to which the report says: "These buttons are of the kind used in the United States army. They are made of brass, marked on the under side 'Isaac, Campbell & Co., 71 Jermyn street, London.' On the upper side some are stamped 'I.,' others 'C.,' and others 'A.' "; 7 bales of "army cloth," in regard to which the report says: "This cloth is of the description used in the United States army, and is of red, yellow, dark blue, light blue, dark green, light green, and other colors"; 1 case, containing "1 dozen cavalry swords and 1 dozen cavalry bayonets, manufactured by Isaac, Campbell & Co."; 14 cases of "army brogans"; 1 case of "water-proof navy boots"; and 606 boxes of tin plate. The rest of the cargo, covered by the bills of lading Nos. 3 and 4, was reported to consist of envelopes, lead pencils, felt hats, woollen undershirts, men's white shirts, linen and spool thread, linen collars, woollen gloves, Congress gaiters, dry goods, scarfs, neck-ties, hair-brushes, men's drawers, and wrapping paper.

In announcing my decision in this case, just before the summer recess, I stated that the opinion of the court in full would be drawn up at a later day. In preparing that opinion, I find that, in a report of the appraisement of the whole of the cargo, made by the prize commissioners, and filed on the 14th of October, 1863, the 53 packages covered by the bills of lading Nos. 2 and 6, the contents of which are not mentioned in those bills of lading, nor in the report on the contents of the packages covered by the bills of lading Nos. 3 and 4, consisted of following articles: 2 cases of oil of peppermint, 10 kegs of saltpetre, 15 casks of mustard, 17 casks of Epsom salts, 2 cases of calomel, 4 casks of carbonate of ammonia, 1 case of gum opium, and 2 cases of nutmegs. The marks and numbers on these 53 packages, as given in the report filed October 14, 1863, identify them with 53 of the packages specified in the marshal's report, filed April 9, 1863, the oil of peppermint being specified in the latter report as drugs, and the calomel, carbonate of ammonia, and gum opium simply as merchandise. The net weight of the saltpetre is stated in the report filed October 14, 1863, to be 1,080 pounds, and that of the coil of rope to be 554 pounds. It appears, by that report, that

what are called in the report of the marshal, filed May 27, 1863, 20 bales of "army blankets, butternut color," consisted of 540 pairs of "gray army blankets," and 24 pairs of "white blankets;" that there were 360 gross of brass navy buttons, marked "C. S. N.," 10 gross of army buttons, marked "A.," 397 gross of army buttons, marked "I.," and 148 gross of army buttons, marked "C.," being, in all, 555 gross; and that there were 8 cavalry sabres, 11 sword bayonets. 992 pairs of army boots, 97 pairs of russet brogans, and 47 pairs of cavalry boots. The entire appraisement of the cargo by the prize commissioners amounted to $184.141.-99, and they appraised the vessel at $7,500.

The depositions in preparatorio of James May, the master, Alexander C. T. L. Hertel, the mate, Patrick Kerns, the boatswain; and Henry Millichamp, the cook and steward, were taken on the 14th of February, 1863.

Upon the hearing of the cause, the counsel for the libellants and captors invoked into this case the proofs taken in the cases of The Stephen Hart [Case No. 13,364], and The Gertrude [Id. 5,369], which were on the docket of this court for trial at the same time with the present case. This invocation was made under the thirty-third standing rule of this court in prize cases, which provides, that "when the same claimants intervene for different vessels, or for goods, wares, or merchandise captured on board of different vessels, and proofs are taken in the respective causes, and the causes are on the docket for trial at the same time, the captors may, on the hearing in court, invoke, of course, in either of such causes, the proofs taken in any other of them, the claimants, after such invocation, having liberty to avail themselves also of the proofs in the cause invoked." The court permitted these invocations to be made. In the cases of The George, 1 Wheat. [14 U. S.] 408, and The Experiment, 8 Wheat. [21 U. S.] 261, the propriety of the practice of invoking testimony from the papers of other vessels in possession of the court is recognized; and, in the case of The Vriendschap, 4 C. Rob. Adm. 166, Sir William Scott permitted the captor to invoke the deposition of the claimant, made in a former case, in which he was owner and master, upon the principle that it was proper to use the deposition, not as decisive of the case then before the court, but as evidence not improper to be taken in conjunction with that which the case afforded. The Stephen Hart was a schooner, captured on the 29th of January, 1862, between the southern coast of Florida and the Island of Cuba. The claimants of the whole of her cargo were Saul Isaac and Samuel Isaac, composing the firm of S. Isaac, Campbell & Co., the same persons who claim to be the owners, jointly with Begbie, of the whole of the cargo of the Springbok. It also appeared, in the case of The Stephen Hart,

that the brokers who had charge of the lading of her cargo were Spyer & Haywood, the same parties who appear as brokers of the cargo in the present case, and as shippers of a part of it, and as agents for Begbie and for S. Isaac, Campbell & Co. It appeared, in the case of The Stephen Hart, that S. Isaac, Campbell & Co. were dealers in military goods, and that the entire cargo of that vessel, consisting of arms, munitions of war and military equipments, was laden on board of her in England, under the direction of S. Isaac, Campbell & Co., in cooperation with the agents, at London, of the Confederate States, with the design that the cargo should run the blockade into a port of the enemy, either in The Stephen Hart, or in a vessel into which the cargo should be trans-shipped at some place in Cuba, and that S. Isaac, Campbell & Co. intrusted to the agent of the Confederate States in Cuba the determination of the question as to the mode in which the cargo should be transported into the enemy's port. The cargo of the Stephen Hart was condemned by this court, as lawful prize, on the ground that, being contraband of war, it was sent from England with an ostensible destination to Cuba, but with a real destination to the enemy's country, by S. Isaac, Campbell & Co. The Gertrude was a steamer captured on the 16th of April, 1863, in the Atlantic Ocean, off one of the Bahama islands, while she was on an ostensible voyage from Nassau, N. P., to St. John's, N. B. The libel was filed against her in this court on the 23d of April, 1863, and she was condemned, with her cargo, as lawful prize, on the 21st of July, 1863. No claim was put in to either the Gertrude or her cargo. It appeared that she cleared from Greenock on the 22d of January, 1863, for Nassau and Havana. She was registered at the custom-house in London, her certificate of registry being dated January 10, 1863, in the name of Thomas Sterling Begbie, as her sole owner, and she is stated in such certificate to have been built in Glasgow on the 6th of January, 1863. The testimony in the case of The Gertrude showed that she belonged to Thomas Sterling Begbie, of London; that her cargo consisted, among other things, of hops, dry goods, drugs, leather, cotton cards, paper, 3,960 pairs of gray army blankets, 335 pairs of white blankets, linen, woollen shirts, flannel, 750 pairs of army brogans, Congress gaiters, soda ash; 500 boxes of tin plate, and 24,900 pounds of powder; that she was captured after a chase of three hours, paying no heed to four guns that were fired by her captor, but endeavoring to escape; that, when captured, she was making for the harbor of Charleston, her master knowing of its blockade, and having on board a Charleston pilot under an assumed name; that her cargo was shipped at Nassau by Henry Adderly & Co., for St. John's, N. B., by a bill of lading to order, indorsed by them in

blank, and that she had on board a consignee's letter from Henry Adderly & Co., addressed to Messrs. W. & R. Wright, St. John's, N. B.

An examination of the marshal's report of the contents of the packages on board of the Springbok mentioned in the bills of lading Nos. 3 and 4, filed May 27, 1863, and of the prize commissioners' report of the contents of the packages composing the cargo of the Gertrude, filed June 1, 1863, discloses some singular facts. The report in the case of The Springbok specifies 18 bales of "army blankets, butternut color," each marked "A." in a diamond, and numbered 544 to 548, 550, 552, and 555 to 565. The report in the case of The Gertrude shows a large number of bales of "army blankets," each marked "A." in a diamond, and numbered with various numbers, scattered from 243 to 534, and then commencing to re-number again at 600. In the inventory and appraisement of the cargo of the Springbok, before referred to, filed October 14, 1863, these 18 bales of blankets are set out as being each marked "A." in a diamond, "G. C.," and numbered 544 to 548, 550, 552, and 555 to 565, and as being "gray army blankets." In an inventory and appraisement of the cargo of the Gertrude, made after her condemnation, and filed August 25, 1863, the bales of army blankets found on board of her are described as each marked "A." in a diamond, "G. C," and as being numbered with various numbers, scattered between 237 and 534, there being none higher than the latter number, and as being "gray blankets." So, also, in the cargo of the Springbok is found a bale marked "A." in a diamond, and numbered 779; while, in the cargo of the Gertrude are found bales, each marked "A." in a diamond, and numbered 780, 782, 784, 786, 788, 789 to 799. So, too, in the Springbok are found 9 cases, each marked "A." in a diamond, and numbered 976 to 984, and 4 bales, each marked "A." in a diamond, and numbered 985 to 987 and 989, all of which cases and bales are specified in the appraisement report of October 14, 1863, by the same marks and numbers, and the 4 bales are therein stated to be "men's colored travelling shirts." In the Gertrude are found 5 bales, each marked "A." in a diamond, and numbered 988, 990 to 992, and 998, and which, in the appraisement report of August 25, 1863, are specified by the same marks and numbers, and described as "men's colored travelling shirts." In the Springbok are found 4 cases of men's white shirts, each marked "A." in a diamond, and numbered 994 to 997. So, also, in the Springbok are found packages, each marked "A." in a diamond, "S. I., C. & Co.," and numbered 1221 to 1234, containing spool cotton and linen thread, and a package similarly marked, and numbered 1247, containing linen collars, and 3 packages similarly marked, and numbered 1267 to 1269, containing men's hose and gloves; also, 3 pack-

ages marked "A." in a diamond, and numbered 1264 to 1266, containing the navy and army buttons before mentioned; also, 9 cases, similarly marked (which, however, are specified in the report of October 14, 1863, as each marked "S. B." in a diamond, "S. I., C. & Co."), and numbered 1289, 1300, 1304, 1306, 1322, and 1351, and containing shirts and drawers; also, 2 cases, each marked "A." in a diamond, and numbered 1307 and 1308, containing hose; also, 6 bales of army cloth, similarly marked, and numbered 1400 to 1405; also, 1 case, similarly marked, and numbered 1406, containing cavalry swords and bayonets; also, 1 case, similarly marked, and numbered 1407, containing gloves, scarfs, &c.; also, 1 case, similarly marked, and numbered 1408, containing hair-brushes; also, 114 cases of Congress gaiters, similarly marked, and numbered 1309 to 1335, 1351 to 1435, 1437 and 1440; also, 14 cases, similarly marked, and numbered 1336 to 1349, containing army brogans; also, 1 case, similarly marked, and numbered 1350, containing water-proof navy boots. In the cargo of the Gertrude are found 35 cases of Congress gaiters, each marked "A." in a diamond, and numbered 1170 to 1204; also, 10 cases of army brogans, similarly marked, and numbered 1205 to 1214; also, 1 case, containing shirts, similarly marked, and numbered 1285. On board of the Springbok is found 1 bale of brown wrapping paper, marked "A." in a diamond (and which is specified in the report of October 14, 1863, as marked "A." in a diamond, "T. S. & Co."), and numbered 264. On board of the Gertrude are found a large number of bales of wrapping paper and other paper, marked "A." in a diamond, "T. S. & Co.," and numbered with numbers scattered between 1 and 170. In only one instance, so far as I have observed, is the same number found on a package in each cargo—the case of needles, in the Springbok, being marked "A." in a diamond, and numbered 998, and a case of men's colored travelling shirts, in the Gertrude, being also marked "A." in a diamond, and numbered 998. It would appear, from this comparison of the marks and numbers on the packages in the two cargoes, that the marking and numbering of a large portion of the packages composing both cargoes were parts of one single transaction, the numbers found in one cargo not being found in the other.

The object of the invocation into the present case of the Stephen Hart and the Gertrude is, as is claimed on the part of the libellants, to show that S. Isaac, Campbell & Co., who claim an interest in the whole of the cargo of the Springbok, were the claimants of the entire cargo of the Stephen Hart; that Thomas Sterling Begbie, who claims an interest in the whole of the cargo of the Springbok, and who appears to have chartered her from her owners for the voyage on which she was captured, was the sole owner

of the Gertrude; that Spyer & Haywood, who style themselves the agents of Begbie, the charterer of the Springbok, and also the agents of S. Isaac, Campbell & Co., in respect to the cargo of the Springbok, and who are also the brokers of that cargo, and the signers of its manifest, and the shippers, by the bills of lading, of a large portion of that cargo, were the brokers of the cargo of the Stephen Hart; and that there is the singular correspondence, which has been pointed out, between the marks and numbers on the packages in the Springbok and those on the packages in the Gertrude. The conclusion sought to be drawn from all these circumstances is that, as it is satisfactorily established that the cargoes of both the Stephen Hart and the Gertrude were, when captured, on their way to the enemy's country, into which they were designed to be introduced by a breach of blockade, and as S. Isaac, Campbell & Co. were interested in the entire cargo of the Stephen Hart, and are interested in the entire cargo of the Springbok, and as Begbie is interested in the entire cargo of the Springbok, and was the sole owner of the Gertrude, and as the brokers of the cargo of the Springbok are the same persons who were brokers of the cargo of the Stephen Hart, and as the cargoes of the Gertrude and the Springbok appear, to a large extent, to have been marked and numbered for shipment under a single system of marking and numbering, the inference is a fair one that the cargo of the Springbok had the same destination which this court has found to have been the destination of the cargoes of the Stephen Hart and the Gertrude. This inference I regard as a very proper one, and as warranted by the proofs invoked. In addition to the practice of invocation, it is the uniform custom of prize courts to take cognizance of the status of the claimants who appear before it, with a view to see whether they come with clean hands, or whether they have been before engaged in a traffic similar to that with which they are charged in the particular case. Thus, in The Juffrouw Elbrecht, 1 C. Rob. Adm. 127, the vessel was claimed as neutral property by a person who was said, by Sir William Scott, not to be a "novus hospes" in the court, but to have appeared in former cases, in one of which he had sworn that a vessel was his property, when it was proved in evidence that she continued to be the property of her former enemy owner. Sir William Scott says: "The effect of this experience on our parts will be not to shut the door against him, because every case is to be examined principally by its own evidence; but, at the same time, it would be wrong to set up technical rules against the rules of common justice and reason, and to consider him as a person whose claims in this court do not require an investigation peculiarly strict." So, also, in The Argo, 1 C. Rob. Adm. 158, Sir

William Scott remarked, that the vessel was asserted to have been purchased in the enemy's country for parties claiming to be neutrals, whose transactions had appeared before the court, in other cases, not much to their advantage. He added: "Although it is not on considerations of this kind that I must determine the present case, I cannot entirely overlook the conduct of parties, as far as it has judicially pressed itself on my notice." "The circumstances of a case may be such as to make it utterly incredible, although there are confident attestations in support of it. The circumstances may be highly unnatural and irreconcilable with any view of a fair transaction. The court must undoubtedly be upon its guard against running wild upon mere general presumptions, but it must judge of the common transactions of life upon the same ordinary principles on which the probity and fairness of such matters is examined in the general practice of mankind." In The Rosalie and Betty, 2 C. Rob. Adm. 343, Sir William Scott says: "In considering this case, I am told that I am to set off without any prejudice against the parties from anything that may have appeared in former cases; that I am not to consider former circumstances, but to suppose every case a true one till the fraud is actually apparent. This is undoubtedly the duty, in a general sense, of all who are in a judicial situation; but, at the same time, they are not to shut their eyes to what is generally passing in the world—to that obvious system of covering the property of the enemy, which, as the war advances, grows notoriously more artificial. Higher prices are given for this secret and dishonorable service, and greater frauds become necessary. Old modes are exploded as fast as they are found ineffectual and new expedients are devised to protect the unsound part better from the view of the court. Not to know these facts, as matters of frequent and not unfamiliar occurrence, would be not to know the general nature of the subject upon which the court is to decide. Not to consider them at all, would not be to do justice. The very nature of the inquiry necessarily suggests something of this kind, for the inquiry is to see whether the property does bona fide belong to those who are ostensibly represented to be the proprietors. It is an inquiry, therefore, which is necessarily attended with some doubt in limine. No reasonable man will say that the court is to look at cases in the same manner where no special reason for fraud exists, and where the enemy is driven to it by a necessity that is notorious, as the only means of getting home his property, and when such artifices are not unfrequently known to prevail; and more especially when the persons appearing as claimants have been exposed to the experience of the court, as having engaged in such a trade, and do not stand before the court with those

general credentials which belong to the conduct of a pure and unimpeached neutrality. I am afraid the observation of those who attend this court will apply these remarks to the owner of the ship. The claimant of the cargo has not, in my recollection, appeared before the court on any former occasion. I do not say that the conduct of the owner of the ship will, in general, affect the cargo; but, if the parties appear bound up together, in an intimate connexion and co-operation, in measures which a court cannot see without disapprobation, such an occurrence cannot but form a foundation for the unfavorable reception of the case of a party so connected in that transaction." In the case of The Experiment, 8 Wheat. [21 U. S.] 261, which was a case of alleged collusive capture by a privateer, Mr. Justice Story, in delivering the opinion of the court, says: "It cannot escape the attention of the court that this privateer has already been detected in a gross case of collusive capture, on the same cruise and under the same commission. This is a fact of which, sitting as a court of admiralty, we are bound to take notice; and it certainly raises a presumption of ill faith in other transactions of the same parties, which can be removed only by clear evidence of honest conduct. If the circumstances of other captures during the same cruise are such as lead to serious doubts of the fairness of their character, every presumption against them is greatly strengthened; and suspicions once justly excited in this way ought not to be easily satisfied." In The Nancy, 3 C. Rob. Adm. 122, Sir William Scott alludes to the fact that the claimants in the case had not conducted themselves, in some cases which had come before the court, with that purity which ought to distinguish the conduct of considerable merchants. The case of The Nancy is cited with approbation in Mos. Contr. War, 99, as supporting the principle that the known character of the owners and agents of a vessel, as connected with contraband trade, is a circumstance to be considered upon the question as to whether there be so much reason to doubt the regular papers of the vessel as to warrant the court in disregarding them.

The principles laid down in the cases I have cited apply with peculiar force to the present case. I referred, in my opinion in the case of The Stephen Hart, to the manner in which the trade in contraband goods, and in running the blockade to the ports of the enemy had been carried on during the present war. A large portion of that trade has been conducted through the port of Nassau, the goods being sent from England to that port, and there trans-shipped in bulk into swift steamers, such as the Gertrude was, in which to be carried through the blockade. This course of trade has come to be a regular system, and when parties like S. Isaac, Campbell & Co. and Begbie are before the court, who have been engaged in carrying on

that species of trade in other cases, it is impossible for the court to shut its eyes to the notorious character of the traffic, or to the unfavorable position occupied by the claimants.

I announced, in the case of The Stephen Hart, the leading principles of public law which apply to the present case, and also to the case of The Peterhoff [Case No. 11,-024], and discussed them at considerable length. Those principles, as established by the highest authorities in England, as well as in this country, are, that articles contraband of war, destined for the aid and use of the enemy, and on transportation by sea to the enemy's country, are liable to capture as lawful prize of war, if seized while being so transported; that, if a cargo is despatched from a neutral port with an intention, on the part of the person despatching it, that, in violation of a blockade known to exist, it shall enter a port of the enemy, it may be captured as lawful prize; that contraband articles destined, on their departure from a neutral port, to be delivered to the enemy, either by being carried directly into a port of the enemy in the vessel in which they leave the neutral port, or by being trans-shipped, at another neutral port, into another vessel, are the subject of capture; that, if the contraband articles are really intended to be delivered to the enemy at some other place than the neutral port named in the papers of the vessel as the destination of the cargo, and that neutral port is to be used merely as a port of call or of trans-shipment and the goods are not to be delivered there for discharge and general consumption or sale there, and if, in that way, the representations contained in the papers of the vessel are false and fraudulent as to the real destination of the goods, they are liable to capture; that no principle of the law of nations, and no consideration of the rights and interests of lawful neutral commerce, requires that the mere touching at a neutral port, either for the purpose of making it a new point of departure of the vessel to a port of the enemy, or for the purpose of transshipping the contraband goods into another vessel, which may carry them to the destination which was intended for them when they left their port of departure, can exempt the goods from capture; that the division of a continuous transportation of contraband goods into several intermediate transportations, by means of intermediate voyages by different vessels carrying such goods, cannot cause a transportation which is, in fact, a unit, to become several transportations, although to effect the entire transportation of the goods requires several voyages by different vessels, each of which may, in a certain sense, and for certain purposes, be said to have its own voyage, and although each of such voyages, except the last one in the circuit, may be between neutral ports; that such a transaction cannot make any of the

parts of the entire transportation of the contraband goods a lawful transportation, when the transportation would not have been lawful if it had not been thus divided; that, whether the vessel is to stop at the neutral port merely as a port of call, and then go on to the enemy's port, or whether the cargo is to be trans-shipped, at the neutral port, to another vessel, to be transported to the enemy's port, there is, in either case, an absence of all lawful neutral commerce to a neutral port, and the transportation of the contraband goods is, in either case, to be considered as a unit, from the port of lading to the port of delivery in the enemy's country; that if any port of such transportation be unlawful, it is unlawful throughout; and that the contraband goods are subject to capture, as well before arriving at the neutral port as during their transportation by sea from such neutral port to the port of the enemy. I shall not recapitulate here the authorities and the reasoning on which these principles are upheld, but shall refer to my opinion in the case of The Stephen Hart, for their full exposition; and I do this the more readily, as the cases of The Stephen Hart and The Peterhoff, as well as this case of The Springbok, have, it is understood, been carried, by appeal, to the supreme court of the United States.

The first inquiry is, whether, upon these principles, the cargo of the Springbok is liable to condemnation. The contraband goods on board of the Springbok are alleged to be the army blankets, the navy buttons, the army buttons, the army cloth, the cavalry swords, the bayonets, the army brogans, the navy boots, the tin plate, and the coil of rope, to say nothing of the saltpetre and the drugs, which formed a portion of the contents of the packages covered by the bills of lading Nos. 2 and 6, the contents of which packages were not embraced in the report of the marshal filed May 27, 1863, but were only disclosed in the appraisal report of the prize commissioners filed October 14, 1863. While I do not decide that all of these articles are necessarily contraband of war, it is sufficient to say that some of them are clearly so. The well-settled rule of law is that, where contraband goods, destined for the use of the enemy, are found on board of a vessel, all other goods on board of that vessel belonging to the owner of the contraband articles, even those goods which are innocent, must share the fate of the contraband goods. Halleck, Int. Law, p. 573, c. 24, § 6. The penalty of contraband extends to all the property of the same owner, involved in the same unlawful transaction; and, therefore, if articles which are contraband, and are going to the enemy are on board of the same vessel with articles which are not contraband, and all the articles belong to the same owner, all will be alike condemned, the innocent articles being affected with the contagion of the contraband articles. 3 Phillim. Int. Law, § 277; 2 Wildm. Int. Law, 217; The Sarah Christina, 1 C. Rob. Adm. 237. As, in the present case, the entire cargo is claimed by the same owners, if the contraband articles are to be condemned as having been on their way to the enemy at the time they were seized, all the rest of the cargo must be condemned.

I now proceed to an examination of the depositions in preparatorio taken in the present case. Captain May says that he does not know on what pretence the capture was made. Hertel, the mate, says that the seizure was made on the supposition that the cargo was contraband of war. Kerns, the boatswain, says that he understood that the seizure was made because the bills of lading did not show what was in some of the cases on board. Millichamp, the cook and steward, says that he understood they were captured because they had goods contraband of war on board, and that he heard no other reason given. It is very singular that Hertel and Millichamp, both of them, assign the suspicion of contraband as the alleged reason for capture, and that Kerns assigns substantially the same reason, namely, that the bills of lading did not show the contents of some of the packages, while Captain May assumes not to know what reason was assigned for the capture. It is ascertained that there were contraband goods on board, and it also appears that the contents of a very large portion of the packages covered by the bills of lading are not disclosed in the bills of lading, or in any other papers on board of the vessel, and that the only articles which are specified either in the bills of lading, the manifest, the cargo books, or any other papers found on board of the vessel, are the tea, coffee, ginger, pimento, cloves, pepper, and tin. Captain May says that the vessel was bound to Nassau, N. P., when seized; that the voyage began at London, and would have ended at some port in the United Kingdom; that the cargo was general merchandise; and that he is not aware that she had any goods contraband of war on board. That she had contraband goods on board, and what they were, we have already seen. It is a principle of prize law, that a master cannot be permitted to aver his ignorance of the contents of contraband packages on board of his vessel; and that he is bound, in time of war, to know the contents of his cargo. The Oster Risoer, 4 C. Rob. Adm. 199. Hertel says that the voyage began at London, and was to have ended, according to the shipping articles, at any port of the United Kingdom of England or Ireland, or any port on the continent of Europe between Brest and the river Elbe; that the voyage was to Nassau; that he does not know where they intended to go after leaving Nassau; that they intended to discharge their cargo at that place; that it was a general cargo; that he has no knowledge, information, or belief as to the contents of the packages; that he took them all on board and gave receipts for them; and that, to the best of his knowledge, information, and be-

lief, there were on board no goods contraband of war. Kerns says that the vessel was bound to Nassau with a general cargo, the contents of which he does not know, and that he does not know that she had on board any goods contraband of war. Millichamp says that the voyage was from London to Nassau, and thence to any port in the West Indies, North America, or the United States, and thence back to any port in the United Kingdom, according to the shipping articles which he signed; that the cargo was all on board when he joined the vessel, except two cases or boxes, which were put on board the day before they sailed; and that he knows nothing concerning the cargo, or whether or not she had on board anything contraband of war. The two cases referred to by Millichamp are undoubtedly the two packages mentioned in the bill of lading No. 3, and which are the sole contents of that bill, one of them being the bale of brown wrapping paper, and the other being one of the two cases containing the army buttons. Bill No. 3 is dated December 8, while bills Nos. 2 and 6 are dated December 6, and bills Nos. 4 and 5 have no date. Captain May says that the vessel was consigned to B. W. Hart, Esq., Nassau, and the cargo to the order of the charterers, indorsed on the bills of lading; that the goods were to be delivered at Nassau for account and risk of Begbie & Co., of London, the charterers; and that he does not know to whom the goods would belong, if restored. Hertel says that the cargo was shipped by Spyer & Haywood, of London, consigned to B. W. Hart, of Nassau; and that it was to have been delivered at Nassau, but he cannot say for whose real account, risk, or benefit. Captain May says that there were three sets of either three or four bills of lading of the goods on board of the vessel; and that there were no false bills of lading, nor any signed other than those on board when she was taken. He also says that there were no papers on board showing the ownership of the cargo; and that the charter-party for the voyage was signed by Begbie & Co. The master and all on board knew of the blockade of the ports of the enemy.

I am entirely satisfied, from all the evidence in the case, that the cargo of the Springbok was intended to be delivered in the enemy's country, by trans-shipment at Nassau into a vessel in which it should be carried through the blockade, and that such was the intended destination of the cargo on its departure from England. The papers found on board of the vessel, so far as they represent Nassau as the ultimate destination of the cargo, were false and simulated. There was no bona fide intention of landing the cargo at Nassau for sale or consumption there, so that it might be incorporated at Nassau into the common stock in that market; but, if it was to be landed there at all, it was only to be so landed for the purpose of being trans-shipped, in bulk, into another vessel, in pursuance of the original destination of the cargo to the enemy's country. The port of Nassau was to be used only as a port of trans-shipment of the cargo. In the case of The Thomyris, Edw. Adm. 17, Sir William Scott says: "It is a clear and settled principle, that the mere trans-shipment of a cargo at an intermediate port will not break the continuity of the voyage, which can only be effected by a previous actual incorporation into the common stock of the country where the trans-shipment takes place. If there was nothing more than a trans-shipment of the cargo from one vessel to another, that will not alter the transaction in any respect, and it must still be considered as the same continuous voyage to the port where the cargo was ultimately to be delivered." Many authorities, to the same effect, were cited by me in the case of The Stephen Hart. The case of The Joseph, 8 Cranch [12 U. S.] 451, may also be referred to.

The absence from the bills of lading of all mention of the contents of any of the packages composing the cargo, except the tea, coffee, ginger, pimento, cloves, and pepper, and the fact that the manifest makes no mention of the contents of any of the packages, leads to the conclusion that, if the master did not in fact know what were the contents of the packages, his ignorance was a studied ignorance. But the more reasonable conclusion, in view of his declared want of information as to the cause of his capture, while the other witnesses frankly declare the cause to have been the suspected presence of contraband goods, or the defective character of the bills of lading, is that his ignorance is affected and not real. The circumstance that all the bills of lading say that the freight is to be paid "as per charter-party," shows that the charterer of the vessel, Begbie, must have been interested in the whole of the cargo. The inference that there was a single ownership of the whole of the cargo, although part of it was shipped in the name of Moses Brothers, and the rest of it in the name, some of Spyer & Haywood, and some of Spyer & Haywood, as agents, is deducible from the fact that Spyer & Haywood, as agents for the charterer, instructed Captain May, on his arrival at Nassau, to report to Mr. Hart for orders as to the delivery of the cargo; and from the further fact, that Spyer & Haywood, as agents for S. Isaac, Campbell & Co., enclosed in a letter to B. W. Hart the bills of lading Nos. 5 and 6, which comprise the entire contents of the cargo, except the two packages mentioned in bill No. 3, being the bale of brown paper and one case of the army buttons; and from the further fact, that Spyer & Haywood signed the indorsement on the charter-party, and also, as brokers, signed the manifest of the entire cargo. There was, therefore, a single ownership for the entire cargo, both contraband and non-contraband; and it is fair to infer, from all the

evidence, that there must have been a single destination for the whole of the cargo. If, therefore, any particular destination can, with certainty, be affixed to any portion of the cargo, the same destination must, on all the evidence, be ascribed to the whole of it.

The absence from on board of the Springbok of any of the invoices of the cargo is a fact of peculiar significance in the present case. The bills of lading mention no articles except the tea, coffee, ginger, pimento, cloves, and pepper. The manifest specifies nothing as to the contents of the packages. The cargo books only mention tea, coffee, ginger, cloves, pepper, and tin. If the invoices had been on board, they would, if they were as true and full as genuine invoices should be, have disclosed the full particulars of the cargo. The inquiry is a pregnant one: Why were the invoices not on board of the vessel? If they had been, their disclosure of the contraband articles could have worked no injury, if those contraband articles were not on their way to the enemy of the United States. What, then, is the proper inference to be drawn from the absence of the invoices? Most certainly, that the contraband articles which were in fact on board, and whose existence was not disclosed by the bills of lading, the manifest, or the cargo books, but whose presence would have been disclosed by true and proper invoices, were on board for some unlawful purpose and upon some unlawful destination. Such purpose could, on all the evidence in the case, only have been to supply the enemy of the United States, and such destination could only have been the country of the enemy. Captain May testifies to the existence of invoices, and says that he believes that invoices and duplicate bills of lading were to be sent to Nassau by mail steamer. Spyer & Haywood, as agents for S. Isaac, Campbell & Co., enclosed to B. W. Hart, of Nassau, in their letter to him of December 8, 1862, "under instructions from Messrs. S. Isaac, Campbell & Co.," "bills of lading for goods shipped per Springbok," but they did not enclose in that letter invoices of the goods covered by the bills of lading. Why should they not have done so, if the goods were, in the way of lawful commerce, to be landed at Nassau for sale or consumption there, and to be incorporated there into the common stock of that market? What other motive could there have been for sending the invoices by mail, as suggested by the master, while the bills of lading were sent by the vessel herself, except to conceal from the officers of any cruiser of the United States by whom the papers of the vessel should be examined on her voyage, all knowledge that contraband articles were on board? And what motive could there be for concealing that knowledge if, in fact, those contraband articles were not destined for the enemy of the United States, but were destined for use or sale at the neutral port of Nassau? The effect of the dissembling of contraband goods in the papers of a vessel is commented upon by Sir William Scott in The Richmond, 5 C. Rob. Adm. 325, and the absence from on board of a vessel in time of war of invoices of her cargo is laid down by all the authorities as being a suspicious circumstance, as affecting the question of the honesty of the commerce. 1 Kent, Comm. 157; Halleck, Int. Law, p. 622, c. 25, § 25. And, in some of the treaties of the United States with foreign countries, it has been provided that, in time of war, the vessels of both nations, being laden, must be provided, among other papers, "with certificates containing the several particulars of the cargo," "that so it may be known whether any forbidden or contraband goods be on board the same." The Amiable Isabella, 6 Wheat. [19 U. S.] 1; Treaty of 1795 with Spain, art. 17 (8 Stat. 148); Convention of 1800 with France, art. 17 (8 Stat. 186). The foundation of this rule of law, which exists and is to be administered, whether embodied in treaty stipulations or not, is that, in time of war, a vessel should be furnished with documents showing the particulars of her cargo, especially where, as in the present case, the vessel is documented for a neutral port in the vicinity of the ports of one of the belligerents, and that neutral port is one extensively used as a mere port of call and of trans-shipment for vessels and cargoes bound to ports of the enemy of the United States, and where, too, the parties claiming to own the cargo have been engaged in previous adventures connected with running the blockade, or introducing cargoes of contraband goods into the enemy's country.

The facts, that the original bills of lading Nos. 5 and 6 made out to "order," are indorsed in blank; that the bill of lading No. 2, which is a duplicate of No. 6, and is a "captain's copy," is indorsed in blank; that the very brief letter of instructions to Captain May from Spyer & Haywood, as "agents for the charterer," dated December 8, 1862, simply directs him to proceed to Nassau, N. P., and, on arrival, report yourself to Mr. B. W. Hart there, who will give you orders as to the delivery of your cargo, and any further information you may require; and that Spyer & Haywood, as agents for S. Isaac, Campbell & Co., sent to Hart the bills of lading for substantially the whole of the cargo, justify the conclusion that the cargo in bulk, as a whole, was put under the orders of Mr. Hart, not to be sold or used at Nassau, but to be forwarded by trans-shipment to some other destination. What was that destination? It is clearly indicated by the initials "C. S. N." stamped upon the 50,000 navy buttons, those initials standing for the words "Confederate States Navy," and by the initials "I.," "C.," and "A.," stamped upon the 80,000 army buttons, which severally represent the words, "Infantry," "Cavalry," and "Artillery." The destination of

those navy buttons was unquestionably the country of the enemy of the United States, which enemy styles itself "The Confederate States of America." The navy buttons must have been destined for the use of the navy of the enemy, and the army buttons were for the use of its army. Such destination was intended by S. Isaac, Campbell & Co., for the buttons are all of them stamped with their name and place of business in London. Such also was the only appropriate destination of the "gray" or "butternut color" army blankets. And all of those articles were to be made of use to the enemy by being introduced into the country of the enemy.

The fact that the claim of the Isaacs and Begbie is not signed by them, but is signed by Mr. Kursheedt, their proctor of record, and that the test oath to the claim is made by the proctor, has not escaped my attention. The claim states everything on information and belief. The test oath, although made on the 24th of March, 1863, forty days after the service of process on the cargo, states that it is impossible to communicate with the claimants, all of whom, it says, reside in London, in time to allow them to make the claim and test affidavit. Yet the affidavit made by the proctor states that his information as to the matters set up by him is derived from letters and communications then very lately received by him from the claimants, and from documents in his possession placed there by the claimants, and which authorize him to intervene and act as agent as well as proctor for them as to the cargo. It would seem as if the time which was sufficient for sending from New York to London intelligence of the capture of the cargo, and for sending back the letters, communications, and documents mentioned, but none of which were placed before the court, would have been sufficient to procure the signatures and oaths of the claimants of the cargo to a claim and a test affidavit. The same gentleman who thus acted as proctor in the case of The Springbok was the proctor for S. Isaac, Campbell & Co., in the case of The Stephen Hart. In that case a claim was put in to the cargo, signed at London, by Samuel Isaac, and the test affidavit thereto was made by him at London. I also find that the test oath made by Mr. Kursheedt in the case of The Springbok, and that made by Samuel Isaac in the case of The Stephen Hart, contain the same peculiar form of averment, that it was not intended that the vessel should enter, or attempt to enter, any port of the United States, or that her cargo should be delivered at any such port. I cannot but regard with suspicion the circumstances that the claim and oath are not made by the claimants, but by their proctor; that so unsatisfactory an excuse is given therefor; that the papers and documents which were so weighty in the mind of the proctor in inducing his oath were not put before the court: and that the test oath is so peculiarly worded.

Upon the whole case, my conclusion is, that there are abundant grounds for condemning, not only the contraband articles found on board of the vessel, as having been destined to the enemy's country, but also the entire cargo, as belonging to the owners of the contraband goods.

It is quite probable, from the coincidence of dates, that it was intended that the cargo of the Springbok should be carried from Nassau to the enemy's country by the Gertrude. Begbie, the owner of the Gertrude, sent her from Greenock, on the 22d of January, to Nassau. The Springbok, chartered by Bebgie, and with a cargo on board in all of which he had an interest, had sailed from Dalmouth for Nassau on the 23d of December previous. She was captured on the 3d of February, about 150 or 200 miles east of Nassau. The Gertrude would, in due course, arrive at Nassau but a few days after the Springbok.

It is claimed that the vessel is not subject to condemnation, even though she was carrying contraband articles intended for the enemy. It is urged that her owners had no interest in any of the cargo, and had chartered her for a voyage specifically to Nassau. where, by the charter-party, she was to deliver the cargo, and that neither her owners nor her master had any knowledge that she was carrying any contraband articles, much less that those contraband articles were leaving England on a destination to the country of the enemy. But the court is of opinion that, under all the circumstances disclosed in this case, the vessel must be held to have been employed in carrying on the unlawful enterprise of transporting contraband articles on their way to the enemy's country, to be there introduced by a violation of the blockade, and that she was so employed under such a state of facts as makes her owners responsible for the unlawful transportation of the contraband articles, and for the acts of the master in relation to such transportation, to such an extent as to justify the condemnation of the vessel. Formerly, the mere fact of carrying a contraband cargo rendered the vessel liable to condemnation, but the modern rule is different. The carrying of contraband articles is now attended only with loss of freight and expenses, unless the vessel belongs to the owner of the contraband articles, or unless there are circumstances of fraud as to the papers and the destination of the vessel or the cargo, and thus an attempt, under colorable appearances, to defeat the rights of the belligerent. The Ringende Jacob. 1 C. Rob. Adm. 89: The Jonge Tobias. Id. 329; The Franklin, 3 C. Rob. Adm. 217. In this last case, the owner of the vessel, who was not the owner of the cargo, was himself a neutral, and had entered into a charter-party for a voyage of the vessel from one neutral port to another neutral port. In

all these particulars, he occupied the position of the owners of the Springbok. But although, in the case of The Franklin, the vessel was ostensibly bound to a neutral port, Sir William Scott held that she was in fact bound to a belligerent port, and condemned her because she had on board contraband goods destined for a belligerent port. And he announces it as the settled rule of law, "that the carriage of contraband with a false destination will work the condemnation of the ship as well as the cargo." Where the owner of the vessel is himself privy to such carriage of contraband, or where the master of the vessel, as the agent of such owner, interposes so actively in the fraud as to consent to give additional color to it by sailing with false papers, the modern relaxation in favor of the vessel no longer exists. The Franklin, 3 C. Rob. Adm. 217, note; The Mercurius, 1 C. Rob. Adm. 288, note; The Edward, 4 C. Rob. Adm. 68; The Neutralitet, 3 C. Rob. Adm. 295. These cases are cited with approbation in Carrington v. Merchants' Ins. Co., 8 Pet. [33 U. S.] 495, 520, 521. In delivering the opinion in that case, Mr. Justice Story says: "The belligerent has a right to require a frank and bona fide conduct on the part of neutrals, in the course of their commerce, in times of war; and if the latter will make use of fraud and false papers to elude the just rights of the belligerents, and to cloak their own illegal purposes, there is no injustice in applying to them the penalty of confiscation. The taint of the fraud travels with the party and his offending instrument during the whole course of the voyage, and until the enterprise has, in the understanding of the party himself, completely terminated."

In the present case, we find that Begbie, the charterer of the vessel, is set up as the owner, jointly with S. Isaac, Campbell & Co., of the whole of the cargo; that Spyer & Haywood, the agents of Begbie, the charterer of the vessel, were also the agents of S. Isaac, Campbell & Co., the co-owners of the cargo; that Captain May, the master of the vessel, is the son of Thomas May, who is one of the three owners of the vessel; that Captain May signed bills of lading for 1,394 packages of merchandise, to be transported, in time of war, ostensibly to the port of Nassau, the principal port of call and trans-shipment for vessels and cargoes destined to ports of the enemy by a breach of blockade; that the contents of only 613 of the packages covered by the bills of lading were specified in them, the articles so specified being only the tea, coffee, ginger, pimento, cloves, and pepper; that he sailed with a manifest specifying not a single article contained in his cargo, but merely giving the marks and numbers on the packages, and describing them as cases, bales, boxes, chests, bags, kegs, and casks; that he sailed without any invoices containing the particulars of his cargo; that he was appointed to the command of the vessel, as he himself says, by her owners; that the only instructions he carried with him were instructions from Spyer & Haywood, as agents for Begbie, the charterer, to proceed to Nassau, and to report himself to Mr. Hart there, and receive orders from him as to the delivery of the cargo; that his failure to demand and carry with him full and clear invoices, containing full particulars of his cargo, was a deliberate one, because he says that the invoices were to be sent to Nassau by mail steamer, thus showing that he knew of the existence of invoices of the cargo; and that he declares his ignorance of the contents of the cargo, or that there were any goods contraband of war on board,—an ignorance which the court cannot, under the circumstances, regard as a real ignorance, and which, if it were a real ignorance, is inexcusable on the part of a master in time of war. The conclusion is irresistible that the master was carrying this cargo, composed, in part, of contraband articles, under false papers. He, and the owners who appointed him as their agent, must be regarded, under the circumstances, as affected with knowledge of the contraband articles on board, and of their destination, to the same extent as if actual knowledge thereof were brought home to the master and the owners. The master, and, through him, the owners, must be held to the same knowledge of the carriage by the vessel of the navy buttons, which could have but one destination, as if they had personally and knowingly put those articles on board. The master's ignorance that such navy buttons were on board, when he would have learned the fact if he had required the production to him, so that he might carry them on board of his vessel, of invoices containing full particulars of the cargo, was a wilful shutting of his eyes, under such circumstances as to make him and the owners of the vessel responsible for the carrying of whatever contraband articles should turn out to be on board, destined for the use of the enemy. Moreover, charged, as he and his owners must therefore be, with knowledge that the contraband articles were on board, and were going to the enemy, the owners must be held responsible for the documenting of the cargo by the master, by means of the bills of lading, to the neutral port of Nassau, when it was in fact destined, composed in part of contraband goods, to a port of the enemy. This was, on the part of the master, for whose acts the owners of the vessel are responsible, a carrying of the contraband articles under a false destination, and with false papers, thus bringing the case directly within the authorities before cited. If the owner of a vessel places it under the control of a master who permits it to carry, under false papers, contraband goods, ostensibly destined for a neutral port, but in reality going to a port of the enemy, he must sustain the consequence of such misconduct on the part of his agent. The Ranger, 6 C. Rob. Adm. 125; Jecker v. Montgomery, 18 How.

[59 U. S.] 110, 119; The Mercurius, 1 C. Rob. Adm. 80. In the Vrouw Judith, Id. 150, the principle is laid down by Sir William Scott, in respect to the act of the master of a vessel in breaking a blockade, that such act binds the owner, in respect to the conduct of the vessel, as much as if it was committed by the owner himself; that, if the master abuses his trust as to the powers with which the law invests him, it is a matter to be settled between him and the person who constituted him master; but that his act of violation is, as to the penal consequences, to be considered as the act of the owner. So, also, in The Columbia, Id. 154, it was held, by Sir William Scott, that the penalty of breaking a blockade attaches to a vessel by the conduct of the master, although the owner be ignorant of the blockade. The principle of that case was that, although the intention of the owner of the vessel may have been innocent, he will be penally affected by the misconduct of his agent, who has misused the trust confided to him, and that in such case, the act of the agent, such as the act of a master in breaking a blockade, affects the owner of the vessel to the extent of the whole of his property concerned in the transaction. The same general principle was recognized by this court in the case of The Hiawatha [Case No. 6,450], and by the supreme court, on appeal, in the same case. 2 Black [67 U. S.] 635, 678. Both courts held that the neutral owners of the cargo of the Hiawatha, though cognizant of the blockade, were responsible for the act of the master of the vessel in violating the blockade. The supreme court affirmed the decision of this court condemning both vessel and cargo, and declared that "the cargo must share the fate of the vessel."

The act of the master of the Springbok in signing bills of lading of the character of those which he signed, and in sailing with a manifest giving no information as to the contents of his cargo, and in not carrying invoices giving particulars of the cargo, and in then testifying to his ignorance as to what he had on board, can be regarded in no other light than as a concealment of the real character of the contraband goods, so as to subject the vessel to condemnation, as the result of such fraud, when, under other circumstances, she might go free, even though the goods were confiscated. Mos. Contr. War, 97, 98. It is well settled that, from the moment a vessel, having on board contraband articles which have a destination to a port of the enemy, leaves her port of departure, she may be legally captured; that it is not necessary to wait until the goods are actually endeavoring to enter the enemy's port; and that, the transportation being illegal at its commencement, the penalty immediately attaches. Halleck, Int. Law, c. 24, sec. 7, p. 573; 2 Wildm. Int. Law, p. 218; 1 Duer, Ins. 626, § 7; The Imina, 3 C. Rob. Adm. 167; The Trende Sostre, 6 C. Rob. Adm. 390, note; The Columbia, 1 C.

Rob. Adm. 154; The Neptunus, 2 C. Rob. Adm. 110.

There has been no application made to the court for leave to furnish further proofs, but an appeal to the supreme court was taken within ten days after the decree was made. Moreover, I do not think this case is one in which the owners of either the vessel or the cargo have so conducted as to entitle themselves to supply further proof. The conduct of the master, representing the owners of the vessel, was such, in affecting his ignorance or concealing his knowledge of the contraband articles on board, as not to justify the favorable consideration of the court towards the vessel; and the owners of the cargo are not parties to whom any such favor can be accorded. The privilege of further proof is always forfeited where there has been any deception or fraud. The Eenrom, 2 C. Rob. Adm. 1.

The vessel and her cargo must both of them be condemned.

[An appeal was taken to the supreme court, where the decree of this court was reversed as to the ship, but without costs or damages to the claimants, and was affirmed as to the cargo. The cause was remanded for further proceedings. 5 Wall. (72 U. S.) 1.]